"FILED"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

00 JUN -2  AM ⁻ ˙ ˙

U.S. DISTRICT COURT
N.D. OF ALABAMA

CHARLES A. COOK,                        )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     )        Case No. CV-98-TMP-1856-W
                                        )
JIM WALTERS RESOURCES, INC,             )
                                        )
        Defendant.                      )

ENTERED

JUN 2 2000

## MEMORANDUM OPINION

        This is an action for disability discrimination under the Americans with Disabilities Act, 42

U.S.C. § 12132, and workers-compensation retaliation under Alabama law, Alabama Code § 25-5-

11.1 (1975).  After suffering an on-the-job injury, plaintiff was terminated from his employment as

a coal miner with defendant on November 18, 1997, he alleges in violation of his right not to be

discriminated against on the basis of disability and his right not to be subjected to retaliation for

having asserted a claim for workers' compensation.  The case is before the court on defendant's

motion for summary judgment, filed January 31, 2000, which has been fully briefed by the parties.

The parties consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge,

pursuant to 28 U.S.C. § 636(c), on September 29, 1998.

## Summary Judgment Standards

        Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,



show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is

2

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

Undisputed Facts

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to the non-moving plaintiff.

Plaintiff was first employed as a coal miner at defendants Number 3 mine in 1979. The Number 3 mine was a "deep-shaft" or underground mine, as distinguished from a surface or strip mine. During the entire period of plaintiff's employment, the Number 3 mine was subject to a collective bargaining agreement between defendant and the United Mine Workers of America ("UMWA"), which controlled many aspects of the employment relationship, including job transfers, assignments, and dismissals. Job assignments, promotions, and transfers were based on a seniority bidding system under which job vacancies were posted for a definite period of time and interested employees would "bid" on the job during the posting period. The qualified employee with the lowest seniority number (i.e., the most senior employee among the bidding employees) was entitled to the job. If no one bid for a job vacancy, however, the defendant then was entitled to reassign an employee to fill the needed job.

During his tenure with defendant, plaintiff worked first as an inside laborer before successfully bidding to the position of motorman. Plaintiff later was reassigned to an inside laborer position and then to the position of pipeman, which he held for several years before his termination. The pipemen in the mine were required to lay water, air, and rock dust pipes, consisting of plastic, aluminum, and steel sections of pipe, twenty feet in length and ranging from as small as one inch in diameter to eight inches in diameter. Most pipes were hung from the roof of the mine shaft or high along the walls in order to be out of the way of vehicles moving through the shafts and corridors. Pipe sections weighed anywhere from 25 pounds to 250 pounds, depending upon the size

4

and composition of the pipe. Pipemen were required to lift the pipe sections into position along the mine-shaft roof, where they were wired into place before being bolted together to form a continuous pipe system. Because the pipe sections were twenty feet in length and heavy, the pipeman foreman had a rule that required one man for each inch of diameter of pipe to assist with the lifting. Thus, a four-inch diameter section of pipe required four men to lift it, six-inch diameter pipe required six men, and eight-inch pipe required eight men. Once the piping in a particular section of the mine was no longer needed, the pipemen were required to "recover" the pipe sections by unbolting the joints, cutting the wire hangers, and lowering the pipe to the mine floor to be removed.

It was on such a pipe recovery assignment that plaintiff was injured on March 9, 1995. Plaintiff and two other pipemen were in the process of recovering four-inch pipe sections, weighing 200 to 250 pounds each. (Plaintiff's Dep. p. 46). Plaintiff was lifting one end of the pipe and another pipeman was supporting the other end, while the third man was cutting the wire hangers. The accident occurred when a wire hanger snapped unexpectedly at plaintiff's end of the pipe section. Rather than allowing the pipe to fall, he caught it to prevent it from hitting the pipeman holding the other end. The weight of the pipe tore the rotator cuffs in both of plaintiff's shoulders.

Ultimately, plaintiff underwent surgery on both shoulders to reconstruct the rotator cuffs. Surgery was performed by Dr. Edward Hillard, who expressed the opinion several times that plaintiff would not be able to return to his job as a pipeman because of restrictions against lifting over his head. On December 27, 1995, Dr. Hillard gave plaintiff a return to work slip, subject to the restrictions of "no repetitive use of arms, no use above chest level, no use over 20 lbs." In a letter to defendant's workers' compensation analyst, dated January 31, 1996, Dr. Hillard again stated that

5

plaintiff could not lift his arms overhead, and "I do not believe that he will be able to return to work unless he can be provided a job that does not require lifting his arms above chest level."

On June 2, 1997, more than two years after the injury, Dr. Hillard conducted another evaluation of plaintiff for "clarification of his current status relative to his ability to work." In the evaluation note, he expressed the following opinions:

> X-rays are taken of both shoulders and both are essentially within normal limits, however he still has pain in both shoulders, weakness in both shoulders, and inability to do any sustained work overhead and by no means any strenuous overhead work. He has severe rotator cuff injuries which were subsequently repaired and it was never felt that he would be able to return to any type of job requiring repetitive, strenuous, or continuous overhead work of any kind involving either upper extremity. I don't think there is any evidence of re-tear or severe exacerbation of his problem but he currently is able to do most any type of activity of daily living or even work at a level below chest high and I have tried to make it clear in the past that if a job were available at which he could work with this restriction he could indeed return to work If his job requires that he do strenuous overhead or repetitive work involving either or both upper extremities it is my opinion that he is still 100% disabled to do this and this will not change in the future.

As a result of that evaluation, Dr. Hillard again gave plaintiff a return to work slip for June 4, 1997, with the restrictions, however, that he do "no repetitive or strenuous or overhead use of both upper extremities — no lifting over waist high." Plaintiff concedes that, even today, he is not capable of returning to work as a pipeman in the mine.

During the entire time of his treatment by Dr. Hillard, plaintiff was receiving temporary total disability benefits from workers' compensation. His treatment and condition was communicated to defendant's workers' compensation staff, who in turn were in direct contact with Dr. Hillard. In February 1997, plaintiff filed suit against defendant for collection of permanent disability benefits under Alabama workers' compensation law, and that suit was settled on November 18, 1997, with

6

a finding of permanent partial disability and an award of benefits.  Within a few days of the settlement, a letter was mailed to plaintiff, dated December 1, 1997, informing him that his employment had been terminated, effective November 19, 1997, under Article III(j) of the collective bargaining agreement.  Plaintiff received the letter on December 3, 1997, and immediately called Mike Johnson, defendant's Director of Industrial Relations at Number 3 mine and advised him that he wanted to file a "first-step grievance" to have the termination letter retrieved.  While it is unclear what was said or explained thereafter, it is clear that plaintiff took no further steps to pursue his grievance or submit the name of a physician willing to certify that he was able to return to work without restrictions.

Plaintiff never specifically requested accommodation by restructuring the job of pipeman (Plaintiff's Dep. p. 208-9) nor is there any evidence that he requested reassignment or transfer to some other job in the mine that did not require the strenuous work and lifting required for a pipeman.  At some unspecified time, plaintiff did discuss with his foreman, Mr. Taft, returning to work under the defendant's "light duty" program.  The "restricted duty" program adopted by defendant at Number 3 mine allowed workers injured on the job to return to work for up to six weeks under certain physical restrictions if, at the end of the period, the employee would be capable of returning to full duty without restrictions.

Prior to the settlement of his workers' compensation lawsuit, plaintiff also initiated a charge of discrimination based on disability with the Equal Employment Opportunity Commission, signing the charge on September 22 and filing it on October 10, 1997.  There, he alleged in part:

7

> My employer has refused to allow me to return to work in any capacity because I cannot perform the same job I had before I was injured. However, there are numerous similar positions which I can perform. The only accommodation I require is a transfer from a pipe fitter to one of the numerous positions at Jim Walter Resources which does not require lifting above the chest.

At Exhibit 23 to Plaintiff's evidentiary submissions in opposition to the motion for summary judgment, plaintiff has offered the job analysis descriptions of various mine jobs. Taking into account Dr. Hillard's restrictions of no overhead work, no repetitive work with arms, and no lifting of more than 20 pounds, only the jobs of ram car operator, heavy equipment operator (surface), bulldozer operator (surface), lampman (surface), and central control operator (surface) were available for possible accommodation. Other jobs listed by plaintiff, such as header person and motorman, required lifting in excess of 20 pounds or repetitive work with the upper extremities. None of the jobs that could serve as an accommodation were open for bidding during 1997. (Plaintiff's Exhibit 14). There is no evidence of their availability before that year. All of the non-managerial jobs at the mine were subject to the bidding process established by the collective bargaining agreement.

The Number 3 mine was shut down in March 1999, resulting in the lay-offs of most employees. Plaintiff's seniority number was not low enough that he would have avoided a lay-off when the mine shut down. Employees with lower seniority numbers than plaintiff (i.e. were hired before plaintiff and had more time on the job) were laid-off.

## ADA Claim

Plaintiff's only federal-law claim is grounded on the Americans with Disabilities Act, 42 U.S.C. § 12132, in which he alleges that he was terminated due to disability discrimination because defendant refused to accommodate his disability by allowing him to return to work in a position that

8

did not require the same strenuous work as that required of a pipeman. Plaintiff points to several jobs at the Number 3 mines that apparently did not require lifting or strenuous overhead work as possible accommodations of his injured shoulders. Defendant responds that it cannot transfer employees to new jobs except through the bidding process established by the collective bargaining agreement, and that to do otherwise would violate the seniority rights of other employees who would be entitled to bid on the job vacancy.

Since it is undisputed that plaintiff could not return to the job he held at the time of the injury, the only issue on this claim is whether the defendant had a legal obligation under the ADA to transfer plaintiff to a different job as an accommodation of his disability. To establish entitlement to relief under the ADA, a plaintiff must show (1) that he has a disability, (2) that he is a qualified individual, and (3) that he was discriminated against because of his disability. Reed v. The Heil Company, 206 F.3d 1055 (11th Cir. 2000); Davis v. Florida Power & Light Company, 205 F.3d 1301 (11th Cir. 2000). There is no dispute that plaintiff has a disability.[1] But, insofar as the pipeman job is concerned, he is not a "qualified individual" because he cannot perform the essential functions of the job, namely lifting heavy metal pipe above his head. Even plaintiff acknowledges that he cannot perform the job. Further, there are no reasonable accommodations that would enable plaintiff to perform the job of pipeman despite his disability. While the use of a ladder might limit the amount

---

[1] The court notes that in Reed v. The Heil Company, 206 F.3d 1055 (11th Cir. 2000), the Eleventh Circuit declined to decide whether a lifting restriction is or is not a disability as a matter of law under the ADA. That court observed that a number of other circuits, however, have held that a lifting restriction is **not** a disability as a matter of law. This court also need not decide whether plaintiff's lifting restriction constitutes a disability because the parties agree that it is in this case and because it is so clear that plaintiff cannot be a "qualified individual" due to his inability to perform the essential functions of the pipeman job.

of overhead work, it would not eliminate it entirely, and it certainly would not help overcome the restriction on lifting more than twenty pounds. Assigning another worker to do the lifting for plaintiff is not an accommodation, but a complete elimination of the work functions required of the plaintiff. If someone else is doing the lifting, what work would plaintiff be doing? What "essential function" of the job would he be performing? The burden rests on the plaintiff to show not only that he proposed an accommodation that was rejected by the employer, but also to show the viability and reasonableness of the accommodation. Reed v. The Heil Company, 206 F.3d 1055, 1062 (11th Cir. 2000) The ADA does not require the employer to eliminate the essential functions of the job as an accommodation. Davis v. Florida Power & Light Company, 205 F.3d 1301, 1305 (11th Cir. 2000). Plaintiff here has failed to show that either he proposed an accommodation for the piepman job or that there existed a reasonable accommodation under which he could perform the essential functions of that job.

Although there is only scant evidence that plaintiff proposed a transfer to another job as an accommodation, he now argues that there were numerous jobs at the Number 3 mine he could have returned to within the restrictions imposed by Dr. Hillard. "Reassignment is only a reasonable accommodation if a position for which the plaintiff is qualified is available." Reed v. The Heil Company, 206 F.3d 1055, 1062 (11th Cir. 2000); see Willis v. Conopco, Inc., 108 F.3d 282, 284 (11th Cir.1997). Thus, to avoid summary judgment, plaintiff must show that, in fact, a vacancy occurred in a job for which he was qualified and that his proposal of being transferred to that job as an accommodation was rejected by the defendant.

His claim fails on all of these points. Although it may be true that he requested a return to work, there is no evidence that he ever applied for a particular job vacancy or suggested any specific

10

job to which he could be transferred.  Thus, plaintiff never "proposed" a specific accommodation.

Further, the evidence fails to establish a congruence between the job vacancies that did occur and

plaintiff's qualifications.  Given plaintiff's physical restrictions, no vacancy occurred in a job for

which he was qualified.  Plaintiff's Exhibit 23 is the job analyses/descriptions of several jobs

performed at the Number 3 mine.  Most of these, however, required overhead work or lifting of

weight in excess of twenty pounds.  The only jobs that did not require these qualifications were ram

car operator, heavy equipment operator (surface), bulldozer operator (surface), lampman (surface),

and central control operator (surface), but there is no evidence that any vacancies occurred in these

jobs.[2]  Plaintiff's Exhibit 14 is a packet of job-vacancy announcements and the bids by employees

interested in the jobs.  None of the five jobs listed above is included.  Thus,  plaintiff has failed to

demonstrate that a job for which he was qualified became available.

But even if such a job became available, plaintiff could not insist on being assigned to that

job as an accommodation if doing so would violate the collective bargaining rights of another

employee.

> The ADA does not require accommodations, such as those [plaintiff] requested, that
> contravene the seniority rights of other employees under a collective bargaining
> agreement.  In so concluding, we join eight other circuits which have held that an
> accommodation that contravenes the seniority rights of other employees under a
> collective bargaining agreement is unreasonable as a matter of law.

---

[2] In his deposition, plaintiff also claimed to be qualified for the positions of header person and motorman; however, these positions also required overhead lifting and lifting of more than twenty pounds.  The header person is required to clear heavy rocks from the conveyors carrying coal and to shovel spilled coal back onto the conveyor.  Clearly such work would require heavy lifting and repetitive use of his upper extremities.  The motorman also is frequently required to clear heavy rocks from the track on which he operates.  Thus, the undisputed evidence fails to establish that plaintiff was qualified for these positions despite the physical limitations imposed by Dr. Hillard.

11

Davis v. Florida Power & Light Company, 205 F.3d 1301, 1306-7 (11ᵗʰ Cir. 2000) citing Willis v.

Pacific Maritime Ass'n, 162 F.3d 561, 566-68 (9th Cir.1998);  Feliciano v. Rhode Island, 160 F.3d

780, 786-87 (1st Cir.1998);  Aldrich v. Boeing Co., 146 F.3d 1265, 1271 n. 5 (10th Cir.1998);

Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir.1998);  Kralik v. Durbin, 130 F.3d 76, 83

(3d Cir.1997);  Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 810 (5th Cir.1997);  Eckles v.

Consolidated Rail Corp., 94 F.3d 1041 (7th Cir.1996), *cert. denied*, 520 U.S. 1146, 117 S.Ct. 1318,

137 L.Ed.2d 480 (1997);  Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1114 (8th Cir.1995).

It is undisputed that all non-managerial jobs at the Number 3 mine were subject to the

UMWA collective bargaining agreement, which expressly provided the seniority-based "bidding"

process for assigning employees to vacant jobs.  Under that process, vacancies were posted for a set

period of time and any employee interested in the job could bid on it.  When the bidding was closed,

management would assess who among all the bidders was qualified for the position and it would be

awarded to the qualified bidder with the most seniority.  Allowing plaintiff to "jump" more senior

employees interested in the same job positions as plaintiff would be a violation of their seniority

rights under the collective bargaining agreement.  As the Eleventh Circuit stated in Davis, such a

proposed accommodation is "unreasonable as a matter of law."

Finally, defendant's "restricted duty" program also provides no basis for an accommodation

of plaintiff's disability.  That program was available to injured employees who would be able to

return to full duty at the conclusion of the six-week restricted-duty period.  It is undisputed that

plaintiff will never be able to return to full duty and, thus, simply did not qualify to participate in the

restricted duty program.  An employer may structure employment programs as it sees fit and is not

required to extend a program to an employee that is otherwise not qualified for it.  See, e.g., Spivey

v. Beverly Enterprises, Inc., 196 F.3d 1309 (11th Cir. 1999) (Pregnancy Discrimination Act did not require employer to give a pregnant employee a "light duty assignment" where only employees injured on the job qualified under the "light duty" program.).

Consequently, plaintiff cannot prevail on his ADA claim. He is not a "qualified individual" for either his old pipeman job, which he admits he cannot perform, and any accommodation based on assignment to a different job would violate the seniority rights of other employees under the collective bargaining agreement. Defendant's motion for summary judgment on plaintiff's ADA claim will be granted.

Workers' Compensation Retaliation

Plaintiff's only remaining claim is grounded on state law, alleging a violation of Alabama Code § 25-5-11.1 (1975) for retaliation for plaintiff's assertion of a workers' compensation claim. In particular, he alleges that defendant terminated his employment, effective November 19, 1997, one day after his workers' compensation action against defendant was settled in retaliation for his having asserted the workers' compensation claim. Defendant has responded to that retaliation claim, denying that his termination was retaliatory, but due to the fact that he was not physically able to return to work as a pipeman.

In a not-yet-released, but widely circulated opinion, the Alabama Supreme Court explored extensively the nature of a retaliatory discharge claim, its elements, and defenses. See Bleier v. Wellington Sears Co., ____ So. 2d ____ , 2000 WL 46147 (Ala., Jan. 21, 2000). There, the court refined the analysis of retaliatory charge claims, holding that the physical ability and willingness of the worker to return to the job was not a part of the employee's *prima facie* case, but a defense to

13

be carried by the employer.  Stated another way, the burden on summary judgment would be on the

moving employer to show by substantial evidence that the employee was not willing or able to return

to work as a defense to the employee's claim of retaliatory discharge.

> We conclude that the "willing-and-able" doctrine is relevant in a retaliatory-
> discharge claim brought pursuant to § 25-5-11.1.  To hold otherwise would give an
> excessively broad effect to the Legislature's retaliatory-discharge exception to the
> employment-at-will doctrine.  However, to accommodate the continued relevance of
> an employee's willingness and ability to work by embedding the "willing-and-able"
> requirement into the elements of the plaintiff's prima facie case of retaliatory
> discharge would exclude a substantial class of employees from the protection of the
> remedy provided by § 25-5-11.1.  We cannot conclude that the Legislature intended
> to exclude that class from the remedy, in the absence of specific direction.  For that
> reason, we decline to follow the precedent taken from the federal statutory remedies
> relied upon in Gargis.  See Pierce v. Franklin Elec. Co., 737 P.2d 921, 925
> (Okla.1987) (exclusion of disabled employee from shield against retaliatory
> discharge would severely undermine objective of Oklahoma's statutory scheme).
> We hold, therefore, that the "willing-and-able" doctrine does not establish an
> element of an employee's prima facie case, *but that the question whether an employee
> is willing and able to return to work is relevant to the defendant's opportunity to
> establish a defense to a claim alleging retaliatory discharge* or to eliminate or reduce
> the damages recoverable for lost wages. [Italics added].

Id., 2000 WL 46147, page 7.

Assuming that the plaintiff here has established a *prima facie* case of retaliatory discharge,

defendant has offered substantial evidence that he was not able to return to work as a pipeman.

Indeed, as already mentioned, plaintiff agrees that he cannot physically perform the job of pipeman.

Consequently, plaintiff also is unable to present any evidence that the reason for the discharge

proffered by the defendant is a mere pretext for retaliation.  The Bleier decision also makes clear that

defendant was not obliged under state law to create a job for plaintiff or transfer him to another

position as an accommodation of his injury: "The Court of Civil Appeals is quite correct in

observing that the statute does not require an employer to create a job specifically designed for an

14

injured employee and does not require an employer to provide the employee with special accommodations to allow the employee to perform a job." Id.  To rebut the defense, plaintiff must present evidence from which a reasonable jury could conclude that, in fact, he could perform the job and that the *sole* reason for his discharge was his invocation of his workers' compensation rights. There is no such evidence here because plaintiff concedes he could not perform the pipeman job. Thus, even assuming he has made out a *prima facie* case, he has not created a genuine issue of material fact to rebut the defense that he was unable to perform the job he held and that he was terminated for that reason.

### Conclusion

Based on the evidence and legal principles discussed above, the court believes that the defendant's motion for summary judgment is well taken.  It will be granted by separate order and the case dismissed with prejudice.

DONE this _____ day of June, 2000.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

15